UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| ALISSA S. THOMAS, | ) | |
|---|---|---|
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:14-cv-00354-SLC** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| *sued as Carolyn W. Colvin, Acting* | ) | |
| *Commissioner of SSA*, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Alissa S. Thomas appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

### I. PROCEDURAL HISTORY

Thomas applied for DIB and SSI in August 2011, alleging disability as of December 31, 2007. (DE 11 Administrative Record ("AR") 156-57, 163-70). The Commissioner denied Thomas's application initially and upon reconsideration. (AR 95-102, 106-11). After a timely request, a hearing was held on June 28, 2013, before Administrative Law Judge Maryann Bright ("the ALJ"), at which Thomas, who was represented by counsel, and vocational expert Charles

---

[1] All parties have consented to the Magistrate Judge. (DE 14); *see* 28 U.S.C. § 636(c).

Mcbee (the "VE") testified. (AR 43-83). On August 9, 2013, the ALJ rendered an unfavorable decision to Thomas, concluding that she was not disabled because, despite the limitations caused by her impairments, she could perform her past relevant work as a picker/store laborer, as well as a significant number of other unskilled, medium exertional jobs in the economy. (AR 96-105). The Appeals Council denied Thomas's request for review, at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Thomas filed a complaint with this Court on November 13, 2014, seeking relief from the Commissioner's final decision. (DE 1). Thomas argues that the ALJ: (1) improperly discounted the credibility of her symptom testimony; and (2) improperly evaluated the medical source statements. (DE 19 at 9-16).

## II. FACTUAL BACKGROUND[2]

At the time of the ALJ's decision, Thomas was 33 years old (AR 84); had a high school education and had recently completed two semesters at Ivy Tech Community College ("Ivy Tech") (AR 51-52, 202); and possessed past work experience as a cook, a head cook, and a picker/store laborer (AR 77, 251). She alleges disability due to sleep apnea, obesity, hypothyroidism, panic disorder with agoraphobia, and major depressive disorder. (DE 19 at 2). Because Thomas does not dispute the ALJ's findings concerning her physical impairments (DE 19 at 2 n.1), the Court will focus on the evidence pertaining to her mental impairments.

### A. *Thomas's Testimony at the Hearing*

At the hearing, Thomas testified that she lives with her five-year-old son in an apartment; she had recently separated from her second husband. (AR 48). She has four other children with

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 482-page administrative record necessary to the decision.

her first husband, but they have lived with their father for the past year (AR 48-49); she sees these children every weekend (AR 69). When necessary, she drives a car to go to doctor appointments, to see her children, and sometimes to school; she had driven herself to the hearing and came alone. (AR 49-50). She said that sometimes she drives her son to preschool, but she usually relies on her husband or a friend to take him; she goes to her children's school activities only if someone picks her up. (AR 59-60). She attends gatherings of friends and family only once in a while, as they usually come to her home; she considers her mother's home a "safe place" and "feel[s] okay there." (AR 59-60, 66-67). Typically, her husband or a friend will go with her to the store. (AR 68). She sees her sister up to four times a week, and her sister helps her cope with her problems. (AR 74-75). She relies on food stamps and Medicaid. (AR 49).

When asked what prevents her from working, Thomas stated that she has agoraphobia and does not like to leave home. (AR 51, 58). She elaborated that she does not like to be in unfamiliar places and wanted to "run out of this room at the moment" (AR 15; *see* AR 66); she described this as feeling "real jittery," like she wants to "cry" and "flip out," and like she is "going to pass out." (AR 66, 75-76). She stated, for example, that when she goes to Walmart she feels like she is going to pass out and has to leave. (AR 69-70). When she has these feelings, she naps for an hour, after which she often feels a little better. (AR 66, 72). She also complained of having problems with concentration, stating that she used to love to read, but now "can't even sit down and read a book any more." (AR 67). She additionally claimed to have memory problems, such as forgetting what items she needs at the grocery store once there; difficulty sleeping; and that she sometimes needs instructions repeated. (AR 67-68, 72). Thomas said that sirens cause her to have panic attacks because she remembers being injured in

3

a past serious car accident. (AR 71). She stated that she has three "bad days" a week where she just rests for 12 hours a day. (AR 72-73). Thomas has participated in some counseling for her symptoms, but she did not find it very helpful and was not doing so at the time of the hearing. (AR 63).

Thomas testified that she had worked full time at McDonald's and as a cook at a nursing home after her alleged onset date, but that each job lasted no more than three months. (AR 52-54). She stated that the cook position ended because the facility did not need her anymore and she had difficulty being away from home. (AR 52-54). Her favorite past job was as a head cook at a nursing home in 2005, which she held for three years, but it ended after she went on pregnancy leave, as she "started having a lot of [her] agoraphobia symptoms at the end of that job." (AR 55-56, 208).

Thomas stated that she had recently completed two semesters in early childhood education at Ivy Tech, taking two or three classes at a time and attending school three days a week; she received "B" grades even though she missed approximately 15 class sessions. (AR 50-52, 66). Sometimes she could not leave home to go to class, and other times she went to class but then had to leave; her teachers were understanding about her absences and let her do some work at home. (AR 51, 72). She stated that a friend or her husband usually took her to school or otherwise she would not go. (AR 58, 70).

### B. *Report of a Past Supervisor*

Thomas began work at McDonald's in August 2010, but quit the job two months later, in October 2010. (AR 229). Her supervisor reported that while Thomas stated when quitting that she could not be around large groups of people, felt anxious, and "would hyperventilate," he

4

never witnessed these anxiety behaviors. (AR 229). He stated that she did call off frequently offering only minimal explanation, but she never had to leave during a work shift. (AR 229). He said that she had no difficulty maintaining a routine, concentrating on assigned work, understanding and carrying out instructions, completing assigned work, working in proximity to others, getting along with supervisors and coworkers, accepting instructions and criticisms, handling change, asking for assistance when needed, and working under normal supervision. (AR 229).

### C. *Summary of the Relevant Medical Evidence*

In April 2010, Thomas was interviewed by Amy Dunn, a clinical social worker at the Bowen Center. (AR 340-43). Thomas came alone and presented as depressed and "relaxed," with a good memory, coherent thinking, a cooperative attitude, and no perceptual abnormalities. (AR 340). She complained of poor concentration and memory, a lack of motivation, low energy, irritability, and fatigue, but reported no problems with anger or behavioral issues. (AR 340). She stated that she has panic attacks and becomes very anxious in crowds; she worries about dying. (AR 340). She had experienced trauma in her past, including being in a serious car accident five years earlier. (AR 340). She denied having any current or past suicidal or homicidal thoughts. (AR 340). She was taking Effexor, but did not think it was working; she had previously taken Zoloft, but stated that had not worked either. (AR 340). She told Ms. Dunn that she had attended counseling in the past but did not find it helpful because she did not follow through with the counselor's recommendations. (AR 340). She stated that if she could not find a job pretty soon, she was going to try and go to college. (AR 340). Ms. Dunn concluded that Thomas met the criteria for a major depressive disorder, recurrent, moderate, and

for panic disorder with agoraphobia, commenting that she had a good prognosis for making significant progress in treatment. (AR 342).

In May 2010, Thomas saw Marla McQuinn, a mental health counselor, for a counseling session. (AR 333). Thomas was frustrated because she wanted to do more with her children, yet she did not want to leave home. (AR 333). Ms. McQuinn noted that Thomas had mild distress, restlessness, and anxiety; overall, her condition was unchanged from her prior visit. (AR 333).

Later in May 2010, Dr. Hani Ahmad, a psychiatrist at the Bowen Center, evaluated Thomas upon referral from Ms. McQuinn. (AR 334). She described feelings of depression, increased worry, anxiety, fatigue, and problems with attention and concentration; she also reported experiencing panic attacks when in public places. (AR 335-36). Dr. Ahmad noted that Thomas's thoughts were linear, logical, and goal-oriented; her mood was good, and her affect appropriate. (AR 335-36). She demonstrated fair judgment and insight; no memory deficits were noted. (AR 336). She had no active suicidal or homicidal thoughts. (AR 337). Dr. Ahmad increased her Effexor dosage. (AR 337). He assigned her a Global Assessment of Functioning ("GAF") score of "50-70" and diagnosed her with a major depressive disorder, recurrent, moderate, without psychotic features; panic disorder with[] agoraphobia; and social anxiety disorder.[3] (AR 30, 338).

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id*.

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the medical sources of record used GAF scores in

In June 2010, Ms. McQuinn documented that Thomas had a mild distress level, an agitated activity level, and an anxious affect; overall, Thomas's condition was unchanged from her last visit. (AR 332). The following week, Dr. Ahmad documented that Thomas seemed to be doing well. (AR 339).

In April 2011, Thomas returned to Dr. Ahmad, stating that she wanted to go back on her medication. (AR 375). She had not seen Dr. Ahmad since June 2010, as she had moved to St. Louis for six months. (AR 375). She had self-discontinued her Effexor in September 2010, and another doctor had prescribed Celexa in November 2010, which Thomas thought had worsened her anxiety. (AR 375). She reported having increased social anxiety lately, as well as frequent panic attacks; she thought her depression, however, was stable. (AR 375). She told Dr. Ahmad that she had a job, but could not keep it due to having increased anxiety in public places. (AR 375). On mental status exam, Dr. Ahmad found no evidence of depression, mania, anxiety, fears, phobia, perceptual abnormalities, self-injurious behavior, or suicidal or homicidal ideation. (AR 376). Dr. Ahmad's other clinical findings, diagnoses, and GAF scores were unchanged from Thomas's May 2010 evaluation. (AR 378).

In June 2011, Thomas saw Dr. Deborah Lazzaro, her family physician. (AR 414). Dr. Lazzaro noted Thomas's panic disorder with agoraphobia that was treated with Klonopin and Zoloft. (AR 414). Dr. Lazzaro wrote that Thomas's nerves remained "on edge" and that she had a tendency to avoid crowds and stay at home. (AR 414). Dr. Lazzaro documented symptoms of anxiety with persistent worry and muscle tension or "jitters," listing Thomas's mental status as "[s]omewhat anxious" with a "[v]aried affect." (AR 415-16).

---

assessing Thomas, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

In September 2011, Thomas saw Dr. Ahmad for a medication check-up. (AR 385). The next month, Thomas returned to Dr. Lazzaro, and she documented the same findings with respect to Thomas's mental status as in June 2011. (AR 463). Thomas saw Dr. Lazzaro later in October for complaints of recent lightheadedness and headaches. (AR 458). At that appointment, Dr. Lazzaro documented essentially the same findings as in the past concerning Thomas's mental status, except that she noted that Thomas was anxious in appearance, tearful at times, and had a slightly blunted affect. (AR 457-61). She additionally noted that Thomas was worrying that her headaches were symptomatic of a brain tumor, which only intensified her anxiety. (AR 457-58). In November, Dr. Lazzaro made essentially the same mental findings as at Thomas's prior visit. (AR 404-07).

Later in November 2011, Thomas underwent a psychological evaluation by Sherwin Kepes, Ph.D., at the request of Social Security. (AR 417-19). She was transported to the appointment by a car service. (AR 417). Thomas was quite upset and tearful throughout her appointment, stating that she just wanted to go home. (AR 418). She reported having depression, some irritability, and significant anxiety both in and out of the house, but mostly out of the house. (AR 418). On mental status exam, Thomas's memory was adequate, and her general judgment and common sense were adequately developed. (AR 418). Dr. Kepes wrote that Thomas reported a variety of symptoms suggesting rather extreme anxiety and panic, which appeared to be rooted in a prior car accident, and that her general level of self confidence and self worth were quite compromised. (AR 419). He strongly encouraged her to continue counseling. (AR 419). Dr. Kepes assigned her a GAF score of 49 and diagnosed her with post-traumatic stress disorder; panic disorder with agoraphobia; and major depressive disorder, single

8

episode, moderate.  (AR 419).

That same month, Benetta Johnson, Ph.D., a state agency psychologist, reviewed Thomas's record and completed psychiatric review technique and mental residual functional capacity ("RFC") assessment forms.  (AR 421-37).  On the psychiatric review technique, Dr. Johnson found mild restrictions in daily living activities, and moderate difficulties in both maintaining social functioning and in maintaining concentration, persistence, or pace.  (AR 435). On the mental RFC assessment, Dr. Johnson indicated that Thomas was moderately limited in three work-related mental abilities: working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and maintaining attention and concentration for extended periods.  (AR 421-22).  Dr. Johnson concluded in her narrative that Thomas could understand, remember and carry-out simple tasks; relate to others on at least a superficial basis; attend to task for sufficient periods of time to complete simple tasks; manage light stresses involved in work-related tasks; and manage unskilled tasks.  (AR 423).  Dr. Johnson noted that Thomas's allegations of panic were not supported by the report of her past employer.  (AR 423). A second state agency psychologist, Donna Unversaw, reviewed and affirmed Dr. Johnson's assessment in March 2012.  (AR 452).

In February 2012, Thomas told Dr. Lazzaro that she had been off of Zoloft and Klonopin for three weeks and had no energy or motivation. (AR 454). Dr. Lazzaro documented essentially the same mental findings as at Thomas's prior visit.  (AR 454-57).  Additionally,  Dr. Lazzaro commented that Thomas was constantly worried about having another episode of vertigo.  (AR

9

454-57).

In October 2012, Dr. Lazzaro documented that Thomas's emotions were somewhat labile with an increase in generalized anxiety; she had been off of her anti-anxiety medication for three months. (AR 479). Dr. Lazzaro also noted that Thomas's depressive symptoms had increased, as she had been off of her Sertraline for three months as well. (AR 479). Thomas stated that she planned to return to counseling, as her Medicaid had recently been reinstated. (AR 479). In November 2012, Dr. Lazzaro noted clinical symptoms of decreased concentration, excessive worry, irritability, and panic. (AR 472). Thomas's depressive symptoms had lessened since being back on Sertraline. (AR 472).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner

10

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520,

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

### *B. The Commissioner's Final Decision*

On August 9, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 27-37). The ALJ noted at step one of the five-step analysis that although Thomas had worked after her alleged onset date, such work did not constitute substantial gainful activity. (AR 29). At step two, the ALJ found that Thomas had the following severe impairments: sleep apnea; obesity; hypothyroidism; panic disorder with agoraphobia; and major depressive disorder, single episode, moderate. (AR 29-30).

At step three, the ALJ concluded that Thomas did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 30-32). Before proceeding to step four, the ALJ determined that Thomas's symptom testimony was not entirely credible (AR 33), and she assigned her the following RFC:

> [T]he claimant has the [RFC] to perform less than the full range of medium work . . . . She can lift/carry and push and pull 50 pounds occasionally and 25 pounds frequently; frequently climb ramps and stairs; occasionally climb ladders, ropes or scaffolds; frequently balance, stoop, crouch, kneel, and crawl. She is unable to engage in complex or detailed tasks, but can perform simple, routine and repetitive tasks consistent with unskilled work; and can sustain and attend to tasks throughout the work day. She is limited to superficial interaction with coworkers, supervisors and the public (with superficial interaction defined as occasional and casual contact not involving prolonged conversation or discussion of involved issues, but allowing for necessary instruction from supervisors); and is limited to

> work in a low stress job, defined as having only occasional decision-making
> required and only occasional changes in the work setting.

(AR 32).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Thomas was able to perform her past relevant work as a picker/store laborer, an unskilled job requiring medium exertion. (AR 35). Additionally, the ALJ found at step five that Thomas could perform a significant number of other unskilled, medium exertional jobs within the economy, including industrial cleaner, floor waxer, and kitchen helper. (AR 36). Therefore, Thomas's claims for DIB and SSI were denied. (AR 36-37).

### C. The ALJ's Credibility Determination Will Be Remanded

Thomas argues that the ALJ improperly evaluated the credibility of her symptom testimony. The ALJ found Thomas's symptom testimony "not entirely credible" for three reasons: (1) an inconsistency between her testimony at the hearing and her description of her agoraphobia symptoms to her treating doctors; (2) that her continued tendency for agoraphobia "typically accompanies her non-compliance with medication"; and (3) her daily activities. Because the ALJ was patently wrong with respect to her first two stated reasons, the ALJ's credibility determination will be remanded.

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th

13

Cir. 2006), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . ." (citation omitted)). "[A]n ALJ's credibility assessment will stand 'as long as [there is] some support in the record[.]'" *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (second alteration in original) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

First, the ALJ found Thomas's hearing testimony inconsistent with her description of agoraphobia symptoms to her treating doctors. The ALJ stated that at five appointments with Dr. Lazzaro, her primary care physician, between June 2011 and February 2012, Thomas described her anxiety as "persistent worry . . . with muscle tension or jitters." (AR 34 (citing AR 406, 415, 455, 459, 464)). The ALJ, however, found it implausible that Thomas would report persistent worry, "yet not report the near confinement to her home that she implied in her testimony." (AR 34). The ALJ then concluded that Thomas's purported "lack of reporting of extreme symptoms to her physicians" reduced her credibility about those symptoms. (AR 38).

But contrary to the ALJ's assertion, four of Dr. Lazzaro's notes dated between June 2011 and February 2012 *do* reflect Thomas's tendency to stay at home due to her agoraphobia. Dr. Lazzaro wrote: "Continued tendency for agoraphobia; avoids crowds *and stays in her own home*." (AR 404, 454, 458 (emphasis added); *see also* AR 414 ("Admits to a tendency to avoid crowds and stay in her own home.")). Thomas also made a similar report to her counselor, Ms. McQuinn, in May 2010, as Ms. McQuinn documented: "She wants to do things w[ith] her kids but doesn't want to leave the house." (AR 333). Therefore, the ALJ was "patently wrong" about

14

his first reason for discounting Thomas's symptoms. *Powers*, 207 F.3d at 435.

As a second reason to discount Thomas's credibility, the ALJ stated: "[T]he medical evidence shows the claimant's 'continued tendency for agoraphobia' typically accompanies her non-compliance with medication." (AR 38 (quoting AR 454)). To illustrate this point, the ALJ cited Dr. Lazzaro's note dated February 2012, which reflected not only that Thomas had a "[c]ontinued tendency for agoraphobia" and "avoids crowds and stays in her own home," but that she had been off of her Zoloft and Klonopin for three weeks.[5] (AR 454). Thomas argues, however, that the ALJ inappropriately "played doctor" by linking her symptoms of agoraphobia primarily to her noncompliance with medication because no medical source opinion made such a finding. (DE 19 at 9-10); *see Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." (citations omitted)). She emphasizes that the record reflects that she experienced symptoms of agoraphobia even when she was compliant with her medication, and furthermore, that Dr. Kepes opined her anxiety and panic symptoms stem from her past car accident, rather than a noncompliance with medication. (AR 419). Thomas's argument is an accurate summation of the record. Although the record reveals that Thomas's anxiety symptoms increased when she went off of her medication, it is still replete with her report of agoraphobia symptoms even when she was taking her medication. (*See* AR 333, 337-39, 404, 414, 417-18, 458). Therefore, although Thomas admittedly was noncompliant

---

[5] There are other instances of Thomas's noncompliance with medication in the record as well. Dr. Lazzaro documented in October 2012 that Thomas had an "increase in generalized anxiety," but that she had been off of her anti-anxiety and anti-depressant medications for three months. (AR 472, 479). Likewise, Dr. Ahmad wrote in April 2011 that Thomas had not been seen since June 2010 and had returned because she "want[ed] to be back on [her] medication," having self-discontinued her Effexor in September 2010. (AR 375).

15

with her medication at times, the ALJ's suggestion that her agoraphobia symptoms only surfaced during such periods of noncompliance is defied by the record.

Additionally, the ALJ was "patently wrong" when she said that Thomas did not explain at the hearing why she was taking her blood pressure and thyroid medications, but not her psychological medications. (AR 34; *see* AR 63). The ALJ considered Thomas's explanation that her noncompliance was due, in part, to her lapse in Medicaid coverage, but nevertheless discredited her, stating that such reason "did not explain why she had some medications but not others." (AR 34). But Thomas *did* explain at the hearing why she was taking her blood pressure and thyroid medications, but not her psychological medications at the time. She stated that Dr. Lazarro prescribed her blood pressure and thyroid medications, and that Dr. Ahmad prescribed her Zoloft and Klonopin. (AR 61). Thomas explained that Dr. Lazzaro, in contrast to Dr. Ahmad, would refill her blood pressure and thyroid medications without an office visit, and Thomas's mother would pay for the medications, so even when her Medicaid had lapsed she could still obtain these medications. (AR 63-64). Thomas, however, had missed her last appointment with Dr. Ahmad because she had lost her Medicaid coverage and could not afford to self-pay; as a result, Dr. Ahmad did not renew her prescriptions. (AR 61-62).

"Equally important, an ALJ must approach issues such as treatment and medication with caution when a claimant has a mental illness." *Barnes v. Colvin*, 80 F. Supp. 3d 881, 887 (N.D. Ill. 2015). "Changes in medication, or sporadic compliance with a prescribed treatment, is not necessarily a sign that a claimant is not credible." *Id.* As the Seventh Circuit has recognized, "mental illness . . . may prevent the sufferer from taking her prescribed medications or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (citations

16

omitted); *see Bradley v. Comm'r of Soc. Security*, No. 3:07-cv-599, 2008 WL 5069124, at *7 (N.D. Ind. Nov. 25, 2008). As such, "it is questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Seamon v. Barnhart*, No. 05-C-13-C, 2005 WL 1801406, at *19-20 (W.D. Wis. July 29, 2005) (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)).

The ALJ did, however, provide a third reason to discount Thomas's credibility that has more traction—Thomas's daily activities. The ALJ considered that Thomas, when necessary, is able to drive herself to doctor appointments, to see her children, to her mother's house, and to school or activities; she even drove herself to the hearing. (AR 31-33). She also had recently finished two semesters at Ivy Tech where she attended classes three days a week, although she had missed approximately 15 class sessions. (AR 33). The ALJ additionally considered that while Thompson said that she experienced some agoraphobia symptoms towards the end of her job as a cook, "primarily she had a complicated pregnancy, which resulted in excessive absences." (AR 33; *see* AR 190 ("My FMLA was up and I had problems with my pregnancy. I was let go.")). The ALJ also mentioned the report from Thomas's supervisor at McDonald's, who stated that while she cited her agoraphobia symptoms as the reason for quitting, he never witnessed any anxiety behaviors on the job and she had never left during her shifts; she did, however, frequently call off work with only minimal explanation. (AR 34).

Thomas does not allege error with the ALJ's consideration of these daily activities. Thus, the ALJ's decision to discount the credibility of Thomas's symptom testimony is not without at least some support in the record. Nevertheless, the Seventh Circuit has cautioned against placing undue weight on a claimant's activities of daily living when making a credibility

17

determination. *See Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("We have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." (collecting cases)). "The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work." *Id*. "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (collecting cases).

Here, Thomas testified that she receives regular assistance from her family and friends with her daily activities—in particular, driving her to school, accompanying her to the store, and helping with her children. (AR 58-59, 68-70, 74). Due to understanding teachers, she also had some flexibility to miss classes at Ivy Tech, which in any event were scheduled just three days a week. *See generally Voigt v. Colvin*, 781 F.3d 871, 877 (7th Cir. 2015) ("Maybe a seriously disabled worker is able to work only by dint of . . . the extraordinary assistance extended to him by kindly fellow workers."). As such, the Court is reluctant to affirm a credibility determination that rests solely on Thomas's daily activities.

Therefore, because the ALJ was "patently wrong" about two of the three reasons she provided for discounting Thomas's credibility, the case will be remanded so that the ALJ may reassess the credibility of Thomas's symptom testimony in accordance with Social Security

Ruling 96-7p and build an accurate and logical bridge between the evidence and her conclusion.[6]

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion

---

[6] Because a remand is warranted to reconsider the ALJ's credibility determination, the Court does not need to reach Thomas's second argument—that the ALJ improperly evaluated the medical source opinions of record, particularly with respect to the GAF scores.

However, having briefly reviewed that argument, the Court encourages the ALJ upon remand to reexamine her cursory rejection of the opinion of Dr. Kepes, who examined Thomas at the request of Social Security and assigned her a GAF score of 49. The ALJ seemingly rejected this opinion simply because it differed from her step-three conclusion finding moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace. (AR 34 ("It should be noted, too, that the low global assessment of functioning score assigned by the psychologist who performed the consultative examination cannot be given significant weight as it suggests serious, rather than moderate, limitations.")). But an ALJ may not simply reject evidence for the sole reason that it differs from her stated conclusion. For meaningful appellate review, the ALJ "must confront the evidence that does not support [her] conclusion *and explain why it was rejected*." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (emphasis added); *see McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (stating that an ALJ must adequately discuss the issues and build an accurate and logical bridge from the evidence to her conclusion).

Additionally, the Court cannot make sense of the ALJ's discounting of the GAF scores assigned by both Drs. Kepes and Ahmad on the basis that they "include, as the reports show, considerations of physical and/or economic pressures which are factors that Social Security does not consider when determining functional psychological limitations." (AR 34). The GAF scale instructions state: "Consider psychological, social, and occupational functioning on a hypothetical continuum of mental health–illness. *Do not include impairment in functioning due to physical (or environmental) limitations*." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000) (emphasis added). Here, contrary to the ALJ's assertion, there is no evidence that Drs. Kepes or Ahmad included consideration of precluded factors when assigning Thomas's GAF scores. Thus, again the Court cannot trace the ALJ's path of reasoning. *Clifford*, 227 F.3d at 874 ("[W]e must be able to trace the ALJ's path of reasoning." (citation omitted)).

As a final matter, the ALJ seemed to credit, at least to a some degree, Thomas's complaints of experiencing panic attacks when in crowds or in public places where crowds might be. (AR 34 ("The claimant has been reasonably consistent in alleging difficulty – including panic attacks – when in crowds or in places where crowds might be, such as Walmart or McDonald's." (citations omitted)). Dr. Johnson, as well, found Thomas was moderately limited in her ability to work in proximity to others without being distracted by them. As such, the Court questions whether a limitation solely to "superficial interaction with coworkers, supervisors and the public"—without any limitation addressing Thomas's *proximity* to crowds or the public—adequately accounts for her stated difficulties with crowds and in public places. *See, e.g.*, *Capman v. Colvin*, No. 1:13cv286, 2014 WL 4494421 (N.D. Ind. Sept. 12, 2014) (affirming an RFC limiting the claimant, who had moderate deficits in concentration, persistence, or pace, from working with the public or in close proximity or cooperation with others), *aff'd*, 617 F. App'x 575 (7th Cir. 2015).

and Order. The Clerk is directed to enter a judgment in favor of Thomas and against the Commissioner.

SO ORDERED.

Enter for this 30th day of March 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge